

# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| STATE OF MISSOURI EX REL. KATHLEEN M. VANDENBOOM, TRUSTEE OF THE KATHLEEN M. VANDENBOOM REVOCABLE TRUST U/T/I DATED MAY 5, 2009,<br><br>Appellant,<br><br>v.<br><br>THE BOARD OF ZONING ADJUSTMENT OF THE CITY OF KANSAS CITY, MISSOURI, ET AL., AND MATT STERLING AND LAUREN THOMPSON,<br><br>Respondents. | WD84013<br><br>OPINION FILED:<br><br>September 7, 2021 |

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable Sandra Midkiff, Judge**

**Before Division Two:
Thomas N. Chapman, P.J., Karen King Mitchell, and Anthony Rex Gabbert, JJ.**

Appellant Kathleen Vandenboom, as trustee of the Kathleen M. Vandenboom Revocable Trust, (the "Trustee"), appeals a decision of the Board of Zoning Adjustment of the City of Kansas City (the "BZA"), which denied the Trustee approval to build a single-family house. The Trustee contends that the BZA's decision was unlawful because it relied on a misinterpretation of the applicable zoning ordinances. Finding no error, we affirm.

## Background

In 1849, Lots[1] 63, 64, and 65 were established in a location that is today the 1600 block of Jefferson Street in Kansas City, Missouri. Each of the three lots was 25 feet wide. Each lot contained an area of approximately 3,250 square feet.

From at least 1960 to 2017, Lots 63, 64, and 65 were held in single ownership. In 2003, Ethel Shepherd conveyed the three lots to Travis Shepherd. In 2015, Travis Shepherd conveyed the three lots to Sean Vincent. In 2017, Sean Vincent conveyed Lot 63 to the Trustee. Prior to the conveyance to the Trustee, the three lots were taxed as one property and had for years been used, fenced, and maintained as one property located at the address of 1619 Jefferson Street.

On January 25, 2019, Helix Architecture + Design submitted an application (on behalf of the Trustee) for approval to construct a single-family home at 1623 Jefferson Street (Lot 63). The city conducted a residential zoning review, and the application was approved on February 6, 2019.

Lauren Thompson ("Thompson"), a resident of the adjacent address at 1625 Jefferson Street, appealed the decision of approval to the BZA,[2] contending that the approval was contrary to the applicable zoning requirements and requesting that the decision of approval be reversed.

On April 9, 2019, the BZA held a hearing on the appeal. City staff provided a report to the BZA, which indicated that the residential zoning review had been approved because the lot in question had previously been legally established and thus section 88-820-01-B of The Kansas

---

[1] One issue in this appeal is whether the three lots are indeed three separate lots or if they merged into one lot pursuant to the lot consolidation provision contained in Code section 88-610-03-C. For the purpose of clarity, we refer to the lots separately to indicate their separate status as of their creation in 1849, rather than to imply their separateness as of the time of the BZA decision.

[2] The BZA is a board of adjustment created by statute to hear appeals of decisions made by an administrative official in the enforcement of a municipality's zoning ordinances. *See* § 89.090, RSMo 2016.

City Zoning and Development Code (the "Code" or the "City's Code") provided that a single-family dwelling could be built on Lot 63. Section 88-820-01-B.1 provided:

> 88-820-01-B. EXCEPTIONS
> 1. A single-family dwelling, wherever permitted as an allowable use, may be erected on any area of land in separate ownership that was in existence at the time of the passage of the original Ordinance No. 45608, passed June 4, 1923, or any subsequent amendment thereto that causes the area of land in separate ownership to contain less area than required to house one family in the district in which it is located, provided all setback, height, and parking requirements of this zoning and development code are met. For purposes of this section, separate ownership means any lot previously established by a recorded subdivision plat or any lot established by a recorded conveyance made prior to March 1, 1954, or made in conformance with subdivision regulations of this code, or as otherwise lawfully established.

In opposition to the decision of approval, Thompson presented evidence regarding the ownership history and prior use of the lots at issue as well as presenting and discussing at length a number of provisions contained in the City's Code. The Lot and Building Standards (Table 110-2) contained in the Code placed minimum lot size restrictions on lots zoned R-6, such as Lots 63, 64, and 65. For conventional development, each lot in this district was required to have a minimum lot area of 6,000 square feet and a minimum lot width of 50 feet. Lots 63, 64, and 65 did not conform to the minimum lot width or lot area in the R-6 district.

Thompson argued that the exception in section 88-820-01-B was an exception for lot area only and presented Code provisions showing that Code section 88-820-01-B was a subcategory of section 88-820-01 ("LOT AREA") that was positioned below a provision describing the method for determining lot area (Code § 88-820-01-A). Thompson noted that there was no exception listed under Code § 88-820-05 ("LOT WIDTH").

Thompson pointed out that the Code recognized certain "nonconformities" and included provisions under which the Code treated recognized nonconformities differently when such nonconformities were lawfully established prior to zoning regulations that rendered such

3

nonconformities out of compliance with the Code. The Code explained the intent of its

provisions regarding nonconformities:

> In older cities such as Kansas City, many lots, uses, buildings, structures and other development features that were lawfully established (i.e., in compliance with all regulations in effect at the time of their establishment) have been made nonconforming by virtue of adoption of the city's first zoning ordinance in 1923 or by subsequent changes to the zoning map or to the zoning regulations themselves. Nonconformity regulations are intended to clarify the effect of this "nonconforming" status and avoid confusion with illegal buildings and uses (those established in violation of zoning regulations). The regulations of this article are also intended to:
>
> 1. recognize the interests of landowners in continuing to use their property for uses and activities that were lawfully established;
>
> 2. promote maintenance, reuse, and rehabilitation of existing buildings;
>
> 3. place reasonable limits on nonconformities that have the potential to adversely affect surrounding properties; and
>
> 4. secure eventual compliance with the standards of this zoning and development code.

Code § 88-610-01-A.

> The Code included provisions governing nonconforming lots.
>
> 88-610-03 – NONCONFORMING LOTS
>
> 88-610-03-A. DESCRIPTION
> A nonconforming lot is a lawfully created lot, shown on a plat or survey map recorded in the appropriate recorder of deeds office that does not comply with the most restrictive minimum lot area or lot width standards of the zoning district in which the lot is now located.
>
> 88-610-03-B. USE OF NONCONFORMING LOTS
> 1. In residential zoning districts, a nonconforming lot may be developed with a detached house.
>
> ….
>
> 88-610-03-C. LOT CONSOLIDATION

4

1. If two or more abutting lots (or portions of abutting lots), one or more of which are nonconforming, are in single ownership, the land involved will be deemed a single lot for purposes of determining compliance with lot size requirements, and no portion of the lot may be sold or used in a manner that diminishes compliance with lot size requirements.

2. In cases where 2 or more abutting lots of record are under single ownership and are deemed a single lot as set forth in paragraph 1 above, the city planning and development director may allow re-establishment of a lot previously combined with an abutting lot in order to accommodate a detached house, provided both of the following conditions are met:

(a) granting of the request results in compatible infill development that is keeping with the pattern of development on the subject block; and

(b) the lot split will not result in the creation of any lot that is less than 30 feet in width.

At the hearing, there was no dispute that Lots 63, 64, and 65 would qualify as nonconforming lots. There was also no dispute that Lots 63-65 were abutting lots which were in single ownership from 1960 to 2017. Thompson argued that, in accordance with the lot consolidation provision, which became effective on January 1, 2011, the lots were to be deemed a single lot for determining compliance with lot size requirements, and that no portion of the lot could thereafter be sold or split off from the consolidated lot in a manner that diminished compliance with lot size requirements. Thus, Thompson argued that when Lot 63 was split off from the consolidated lot in 2017, the Code was violated. Thompson argued further that it appeared as though the city approved the review by examining Lot 63 as a single lot without recognizing that Lot 63 had been one of three abutting lots in single ownership to which the lot consolidation provision applied. [3]

---

[3] Thompson also presented evidence at the hearing regarding her reasons for challenging the initial decision of approval. The initial permit would have allowed the Trustee to construct a house within three feet of Thompson's house. Thompson first learned of plans to develop the land adjacent to her home when preliminary work performed on Lot 63 damaged Thompson's gutters and knocked over a retaining wall. Although the damage was repaired,

5

Near the end of the hearing, the BZA moved to a closed session to receive legal advice pursuant to section 610.021(1).[4]  Upon resuming the hearing, the BZA noted that evidence had been presented during the hearing that Lots 63-65 were held in single ownership dating back to 1960.  The BZA asked city staff whether they were previously aware of that information, to which staff responded that it was not.

A member of the BZA then moved that the Thompson appeal be sustained and the staff decision overturned.  The BZA unanimously voted in support of the motion.

Pursuant to section 89.110, the Trustee filed a verified petition in the Circuit Court of Jackson County, requesting issuance of a writ of certiorari for review of the BZA's decision.  Thompson and her husband, Matt Sterling, filed a motion to intervene, which was granted.  After review, the circuit court entered a judgment affirming the BZA's decision.

The Trustee now appeals to this court.

### Violations of Rule 84.04

The Trustee's sole point on appeal states:

> THE BZA ERRED IN REVERSING THE PERMIT DIVISION DECISION BECAUSE THE BZA DECISION WAS UNAUTHORIZED BY LAW AND ILLEGAL IN THAT ANY BASIS FOR THE BZA DECISION NECESSARILY DEPENDS ON A MISINTERPRETATION OF THE ZONING CODE.

Rule 84.04(d)(2) provides:

> Where the appellate court reviews the decision of an administrative agency, rather than a trial court, each point shall:
>
> (A) Identify the administrative ruling or action the appellant challenges;

___

Thompson was later contacted by the Trustee's builder who stated a need to access Thompson's basement to ensure that construction would not damage the Thompson's foundation.  Thompson then became concerned about the impact of the adjacent development and hired an engineering firm to evaluate the proposed construction.  The firm reported concern about the site drainage plan and the long-term integrity of the foundation systems.

[4] Unless otherwise indicated, all statutory references are to RSMo 2016, as supplemented.

6

(B) State concisely the legal reasons for the appellant's claim of reversible error; and

(C) Explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

The point shall be in substantially the following form: "The [*name of agency*] erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error, including the reference to the applicable statute authorizing review*], in that [*explain why, in the context of the case, the legal reasons support the claim of reversible error*]."

Rule 84.04(d)(4) provides that "[a]bstract statements of law, standing alone, do not comply with this rule." The purpose of these requirements is "to give notice to the opposing party of the precise matters which must be contended with and to inform the court of the issues presented for review." *Crawford Cnty. Concerned Citizens v. Missouri Dep't of Nat. Res.*, 51 S.W.3d 904, 908 (Mo. App. W.D. 2001) (quoting *Franklin v. Ventura*, 32 S.W.3d 801, 803 (Mo. App. W.D. 2000)).

Although the Trustee identifies the BZA's ruling that she challenges and generally asserts legal reasons that could support a claim of reversible error, the Trustee's point fails to sufficiently explain why, in the context of the case, those legal reasons support the claim of reversible error. Rather, the Trustee's point contains an abstract statement of law that violates Rule 84.04(d)(4). "A point relied on which does not state why the legal reasons support the claim of reversible error, but instead sets out an abstract statement of law, is deficient and preserves nothing for appeal." *Crawford Cnty. Concerned Citizens*, 51 S.W.3d at 908.

Further, although the Trustee raises only a single point on appeal, the Trustee's brief presents a multitude of arguments alleging a number of separate and distinct reasons that the BZA's decision was in error. The Trustee contends that the BZA's decision was illegal because the BZA: (1) misinterpreted the lot consolidation provision contained in section 88-610-03-C as

7

applying to Lots 63-65, which were in single ownership prior to the effective date of the provision; (2) erred in determining that the exception contained in section 88-820-01-B did not relieve the Trustee of complying with lot width requirements; (3) erred in determining that the lot consolidation provision contained in section 88-610-03-C was controlling over the subsequently enacted section 88-820-01-B; (4) erred in failing to grant the decision of the permit division a presumption of correctness; and (5) erred in basing its decision on any issues aside from compliance with the zoning requirements of the Code. "A point relied on written contrary to the mandatory requirements of Rule 84.04(d), which cannot be comprehended without resorting to other portions of the brief, preserves nothing for appellate review." *Storey v. State*, 175 S.W.3d 116, 126 (Mo. banc 2005).

By attempting to combine a wide array of distinct legal arguments under a single point, the Trustee's point is multifarious and preserves nothing for review. *Parkview Vale, LLC v. Bd. of Zoning Adjustment for City of Kansas City*, 620 S.W.3d 268, 272 (Mo. App. W.D. 2021). "A point relied on should contain only one issue, and parties should not group multiple contentions about different issues together into one point relied on." *Id.* (quoting *Wennihan v. Wennihan*, 452 S.W.3d 723, 728 (Mo. App. W.D. 2015)).

Compliance with the briefing requirements of Rule 84.04 "is mandatory in order to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made." *Crawford Cnty. Concerned Citizens*, 51 S.W.3d at 908 (quoting *Myrick v. E. Broad., Inc.*, 970 S.W.2d 885, 886 (Mo. App. S.D. 1998)). "Deficient points relied on force the appellate court to search the argument portion of the brief or the record itself to determine and clarify the appellant's assertions, thereby wasting judicial resources, and, worse

8

yet, creating the danger that the appellate court will interpret the appellant's contention differently than the appellant intended or [its] opponent understood." *Id.*

Despite the Rule 84.04 violations in the Trustee's brief, "the policy of the appellate courts in this State is to decide a case on the merits rather than technical deficiencies in the brief." *Wennihan*, 452 S.W.3d at 728 (quotation omitted). In this matter, we exercise our discretion to address, *ex gratia*, the merits of the Trustee's arguments.

## Analysis

The Trustee raises five arguments alleging that the BZA's decision was unauthorized by law. The Trustee contends that the BZA's decision was illegal because the BZA: (1) misinterpreted the lot consolidation provision contained in section 88-610-03-C as applying to Lots 63-65, which were in single ownership prior to the effective date of the provision; (2) erred in concluding that the exception contained in section 88-820-01-B did not relieve the Trustee of complying with lot width requirements; (3) erred in determining that the lot consolidation provision contained in section 88-610-03-C was controlling over the subsequently enacted section 88-820-01-B; (4) erred in failing to grant the decision of the permit division a presumption of correctness; and (5) erred in basing its decision on any issues aside from compliance with the zoning requirements of the Code.

## Standard of Review

On appeal from the BZA's decision, we review "the findings and conclusions of the BZA and not the judgment of the trial court." *Antioch Cmty. Church v. Bd. of Zoning Adjustment of City of Kansas City*, 543 S.W.3d 28, 33 (Mo. banc 2018). The scope of our review is governed by article V, section 18 of the Missouri Constitution, which provides that judicial review of an agency decision "shall include the determination whether the [decision is] authorized by law, and

9

in cases in which a hearing is required by law, whether the [decision is] supported by competent and substantial evidence upon the whole record." *Id.* at 33-34 (quoting Mo. Const. art. V, § 18) (alterations in original).

In this matter, the Trustee does not allege error regarding the competency or sufficiency of the evidence supporting the BZA's decision. Rather, the Trustee's allegations of error relate to the BZA's interpretation of a number of zoning regulations in the City's Code. Accordingly, we review the BZA's decision to determine whether it is authorized by law. Whether the BZA's decision is authorized by law is a legal question we review *de novo*. *Id.* at 34.

An appellate court "interprets ordinances using the same general rules of construction as are applicable to the statutes of the state." *Id.* at 35 (internal quotations omitted). Our "primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute at issue." *Parktown Imports, Inc. v. Audi of American, Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009). We resort "to other rules of statutory interpretation only when the plain meaning of the statute is ambiguous or defeats the purpose of the statute." *Karney v. Dep't of Lab. & Indus. Relations*, 599 S.W.3d 157, 162 (Mo. banc 2020) (citing *Ivie v. Smith*, 439 S.W.3d 189, 202 (Mo. banc 2014)). "When interpreting a statute, no portion of it is read in isolation, but rather is read in context to the entire statute, harmonizing all provisions." *Antioch Cmty. Church*, 543 S.W.3d at 35 (internal quotations omitted).

### Argument One

The Trustee asserts that the BZA erred in interpreting the lot consolidation provision contained in section 88-610-03-C to apply to Lots 63-65. The Trustee contends that, because Lots 63-65 were in single ownership prior to January 1, 2011 (the effective date of the lot

10

consolidation provision), the city's legislative body did not intend for the provision to apply to Lots 63-65. We disagree.

> 88-610-03-C. LOT CONSOLIDATION
> 1. If two or more abutting lots (or portions of abutting lots), one or more of which are nonconforming, are in single ownership, the land involved will be deemed a single lot for purposes of determining compliance with lot size requirements, and no portion of the lot may be sold or used in a manner that diminishes compliance with lot size requirements.
>
> 2. In cases where 2 or more abutting lots of record are under single ownership and are deemed a single lot as set forth in paragraph 1 above, the city planning and development director may allow re-establishment of a lot previously combined with an abutting lot in order to accommodate a detached house, provided both of the following conditions are met:
>
> (a) granting of the request results in compatible infill development that is keeping with the pattern of development on the subject block; and
>
> (b) the lot split will not result in the creation of any lot that is less than 30 feet in width.

The clear intent of the legislative body in enacting section 88-610-03-C is that the provision be applied to abutting, nonconforming lots in single ownership on its effective date. By its plain language, the provision applies when two or more abutting lots, one or more of which are nonconforming, *are* in single ownership. The provision became effective January 1, 2011. Lots 63-65 were abutting, nonconforming, and in single ownership on the effective date of the provision; thus, when the provision became effective, it applied, by very clear language, to Lots 63-65. As a result, Lots 63-65 were "deemed a single lot for purposes of determining compliance with lot size requirements" upon the provision's effective date. As a result, no portion of the consolidated lot could then be "sold or used in a manner that diminishe[d] compliance with lot size requirements." The BZA did not err in determining that Lots 63-65 became consolidated on January 1, 2011, and that no portion of the lots could thereafter be sold

11

or used in a manner that diminished compliance with lot size requirements. If an ordinance "is clear and unambiguous when the terms used are given their legislative definition or their plain and ordinary meaning, then there is no room for construction and the courts must give effect to the [ordinance] as written." *Cousins Advert., Inc. v. Bd. of Zoning Adjustment of Kansas City*, 78 S.W.3d 774, 779 (Mo. App. W.D. 2002).

The Trustee argues that the city's legislative body did not intend the lot consolidation provision to apply to lots that were already in single ownership prior to the effective date of the provision. In support of her argument that the city's legislative body did not intend the result the provision's language indicates, the Trustee points to Code section 88-610-01-B, which addresses the continuation of nonconformities and provides: "Any nonconformity that existed on the effective date specified in 88-10-02[5] or any situation that becomes nonconforming upon adoption of any amendment to this zoning and development code may be continued in accordance with the regulations of this article unless otherwise expressly stated." In this matter, there is no dispute that Lots 63, 64, and 65 were nonconforming lots when the lot consolidation provision became effective under section 88-10-02 (January 1, 2011); therefore, the nonconforming lots could continue in accordance with the regulations regarding nonconformities unless otherwise expressly stated. However, the Trustee fails to recognize that the lot consolidation provision expressly provided that the lots were deemed consolidated on the effective date of the lot consolidation provision, and expressly provided that the lots could not thereafter be sold or used

---

[5] Code Section 88-10-02 provides:

> 88-10-02 – EFFECTIVE DATE
> The provisions of this zoning and development code originally became effective on January 1, 2011, except for 88-405 which became effective on February 14, 2009, and 88-445 which became effective on May 31, 2009. Any amendment thereto shall be effective in accordance with the City Charter or pursuant to the specific terms of the ordinance enacting said amendment.

in a manner that diminished compliance with lot size requirements. Although the Trustee argues that the lot consolidation provision does not include any language expressly indicating it applies to lots that were already in single ownership on its effective date, this argument is contrary to the plain language of the lot consolidation provision, which applies when two or more abutting lots, one or more of which are nonconforming, *are* in single ownership. The provision does not state that it applies to lots that "come to be" in single ownership, nor does it employ language from which we can determine that it applies to circumstances other than those expressly stated: to "two or more abutting lots . . . one or more of which are nonconforming, [that] are in single ownership[.]" § 88-610-03-C.1.

The Trustee makes further arguments regarding potential constitutional implications of the lot consolidation provision if interpreted to apply to lots that were in single ownership on its effective date.[6] The Trustee states in her briefing that "the Trustee is not asserting that the zoning

---

[6] The Trustee contends that a zoning regulation "must permit continuation of non-conforming uses in existence at the time of enactment to avoid violation of constitutional provisions preventing the taking of private property without compensation." *Missouri Rock, Inc. v. Winholtz*, 614 S.W.2d 734, 739 (Mo. App. W.D. 1981). Although this is an accurate statement of the law in Missouri, this proposition is based on the principle that an established "non-conforming use is a vested property right which zoning ordinances may not abrogate." *Id.* In this matter, the Trustee fails to make any arguments or provide any legal support for the proposition that the lawful establishment of a lot in 1849 establishes a vested right in all subsequent owners of the property irrespective of how the lot is subsequently used. "Neither persons nor entities have a vested right in a general rule of law or legislative policy that would entitle either to insist that a law remain unchanged." *State ex rel. Koster v. Olive*, 282 S.W.3d 842, 848 (Mo. banc 2009) (quoting *Beatty v. State Tax Comm'n*, 912 S.W.2d 492, 496 (Mo. banc 1995)). "Neither the granting of a permit, nor the purchase or lease of land in reliance on existing zoning laws, will suffice to establish a nonconforming use such as would insulate land from the exercise of the zoning authority." *State ex rel. Drury Displays, Inc. v. City of Shrewsbury*, 985 S.W.2d 797, 800 (Mo. App. E.D. 1998) (internal citations omitted). Nothing in the record indicates that Lot 63 had been used or maintained as a lot separate from Lots 64 and 65 leading up to the effective date of the lot consolidation provision.

The Trustee makes a number of further arguments asserting that in interpreting the lot consolidation provision, we should consider the constitutional implications of what the Trustee asserts was a retroactive or retrospective application of the provision to lots that were in single ownership prior to the lot consolidation provision's effective date. We first note that the lot consolidation provision operated on the basis of present facts rather than past facts. That is, it did not purport to operate on the basis of facts present prior to 2011, rather it operated in 2011 on the basis of facts present in 2011. Article I, section 13 of the Missouri Constitution prohibits the enactment of a law retrospective in its operation. Retrospective laws are "those which take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability

13

provisions are unconstitutional." Rather, the Trustee contends that we should employ the principle of statutory construction under which "[i]f a statutory provision can be interpreted in two ways, one constitutional and the other not constitutional, the constitutional construction shall be adopted." *Karney*, 599 S.W.3d at 162 (quoting *State v. Vaughn*, 366 S.W.3d 513, 517 (Mo. banc 2012)). However, when there is no ambiguity in the plain language of the legislation, we are "bound to give effect to the intent reflected in the statute's plain language and cannot resort to other means of interpretation." *Id.* (citing *Parktown Imports, Inc.*, 278 S.W.3d at 672).

In this matter, there is no ambiguity in the text of the lot consolidation provision, and we are bound to give effect to the legislative body's intent as reflected in that text. In interpreting laws, we are not authorized to re-write them in contravention of the plain language effected by the legislative body in enacting them. *See id.* An appellate court can, when the issue is properly raised and assuming proper jurisdiction, address the validity of an ordinance or whether it has been unconstitutionally applied. However, in the absence of such a challenge, and in the absence of ambiguity in the text, we are confined to interpret the provision as it is plainly written.

The BZA did not misinterpret the lot consolidation provision contained in section 88-610-03-C of the City's Code.

---

in respect to transactions or considerations already past." *Garozzo v. Mo. Dep't of Ins.*, 389 S.W.3d 660, 665 (Mo. banc 2013). However, in the absence of a vested right,

> there is no article I, section 13 violation when a statute identifies the regulatory issue with reference to a past action but application of the statute is based on the need for a prospective regulatory solution. *See, e.g., State ex rel. Koster v. Olive*, 282 S.W.3d 842, 848 (Mo. banc 2009) (a statute requiring dam owners to obtain a permit did not violate article I, section 13 because it is not the past action that is the sole reason for the requirement; it is the present situation and need for present protection that justifies the permit requirement for preexisting structures).

*Id.* at 666-67. In this matter, it was the situation of the lots present on the effective date of the lot consolidation provision that made the provision applicable to Lots 63-65 in furtherance of a prospective regulatory solution.

14

**Argument Two**

The Trustee argues that the BZA misinterpreted the exception contained in section 88-820-01-B as not relieving the Trustee of complying with lot width requirements. Section 88-820 provides a number of provisions delineating methods for calculating Code measurements.

88-820 – MEASUREMENTS AND EXCEPTIONS

88-820-01 – LOT AREA

88-820-01-A. MEASUREMENT
The total land area contained within the property lines of a lot.

88-820-01-B. EXCEPTIONS
1. A single-family dwelling, wherever permitted as an allowable use, may be erected on any area of land in separate ownership that was in existence at the time of the passage of the original Ordinance No. 45608, passed June 4, 1923, or any subsequent amendment thereto that causes the area of land in separate ownership to contain less area than required to house one family in the district in which it is located, provided all setback, height, and parking requirements of this zoning and development code are met. For purposes of this section, separate ownership means any lot previously established by a recorded subdivision plat or any lot established by a recorded conveyance made prior to March 1, 1954, or made in conformance with subdivision regulations of this code, or as otherwise lawfully established.

2. A single-family dwelling, wherever permitted as an allowable use, may be erected on any area of land established by an approved lot split or subdivision plat.

88-820-02 – LOT AREA PER UNIT
The amount of lot area required for each dwelling unit on the property. For example, if a minimum lot-area-per-unit standard of 1,000 square feet is applied to 6,250 square foot lot, a maximum of 6 dwelling units would be allowed on the property.

88-820-03 LOT DEPTH
The mean horizontal distance between the front property line and the rear property line of a lot measured within the lot's boundaries.

88-820-04 – LOT FRONTAGE
The horizontal distance between side property lines on a lot, as measured along the front property line.

88-820-05 - LOT WIDTH

15

The mean horizontal distance between the side property lines of a lot measured within the lot's boundaries.

The Code goes on to include provisions relating to lot coverage, floor area ratio, gross public floor area, front setbacks, rear setbacks, side setbacks, building height, building coverage, and separation distance.

Section 88-820-01-B.1 provides that a single-family dwelling may be erected on any "area of land" lawfully established that was in existence prior to the original ordinance passed in 1923, provided all setback, height, and parking requirements of the Code are met. This provision addresses what can be done with an "area of land" under certain conditions. The provision considers the erection of a single-family dwelling as a "use" of the land. This conclusion is unmistakable, as the provision applies only when the erection of a single-family dwelling is "permitted as an allowable *use*." It is likewise clear that the provision provides that this potential use is available under the circumstances provided in the exception. The clear intent of the provision is to provide that such use may be made of qualifying areas of land under certain circumstances.

However, the fact that the Code authorizes a particular use does not mean that the lot on which the use is made is considered to be in compliance with the Code's lot size requirements. In harmonizing the exception contained in section 88-820-01-B with the rest of the Code, giving effect to all provisions, it is clear that the Code provides that certain uses may be made of land despite a lack of compliance with Code requirements. For example, a detached house can be built on a nonconforming lot in a residential district. Code § 88-610-03-B.1. Although this *use* may be made of the nonconforming lot, the fact that the Code permits the use on the lot does *not* bring the lot into compliance with the Code. Rather, a nonconforming lot is still a lot that was

16

once lawfully created "that *does not comply* with the most restrictive minimum lot area or lot width standards" of its zoning district. Code § 88-610-03-A (emphasis added).

The section 88-820-01-B exception does *not* state that the area of land on which a single-family dwelling may be built is considered a compliant lot or that the area of land is brought into compliance with lot size restrictions. The provision does not refer to lots at all, nor does it indicate in any manner that the "area of land" is to be considered a compliant lot. Rather, it simply identifies a use (erection of a single-family dwelling) that may be made of the "area of land" under certain circumstances.

Ultimately, the Trustee wants us to conclude that the section 88-820-01-B exception eliminates all compliance requirements other than those contained within the exception, such that Lot 63, despite its prior consolidation with Lots 64 and 65, could be subsequently sold to the Trustee, re-establishing a nonconforming lot that did not comply with lot size requirements without violating the lot consolidation provision's prohibition on sales that diminish compliance with lot size requirements after lots are deemed consolidated. Although it is perhaps arguable that the provision's placement within the Code under the "MEASUREMENTS AND EXCEPTIONS" heading could provide some support for the conclusion that the provision is an exception to measurement requirements, the Trustee does not so argue. To the contrary, the Trustee cites to Code section 88-15-05[7] and argues that the headings do not control the scope of the exception provision. The Trustee appears to take this position due to the fact that the

---

[7] Code section 88-15-05 provides:

>    Headings and illustrations are provided for convenience and reference only and do not define or limit the scope of any provision of this zoning and development code. In case of any difference of meaning or implication between the text of this zoning and development code and any heading, drawing, table, figure, or illustration, the text controls.

17

exception in section 88-820-01-B is positioned as a subcategory of Lot Area (Code § 88-820-01). It is not positioned in a manner that indicates that it is an exception to all measurements, as might be reasonable to conclude if the provision had been placed as a free-standing exception, under "MEASUREMENTS AND EXCEPTIONS." Rather, it is positioned as a subcategory of "LOT AREA," placed between a provision that describes how lot *area* is measured (Code § 88-820-01-A) and one that provides a method for calculating lot *area* per unit (Code § 88-820-02). Thus, even if we were to look to the headings of the Code for guidance, we could only conclude, as the BZA and the intervenors contend, that the exception is to the measurement of lot area only.

To be sure, the Code does provide that the text of provisions controls over headings. Code § 88-15-05. However, the text of section 88-820-01-B.1, although authorizing a use of land under certain circumstances, does not indicate that the land upon which that use is made is considered a compliant lot (or a lot at all), so as to remove that area of land from the lot consolidation provision's prohibition on sales that diminish compliance with lot size requirements. Put another way, even if a house were to be built on an "area of land" pursuant to section 88-820-01-B, if the "area of land" does not comply with minimum lot size requirements, the house still sits on a nonconforming lot, which is one that *does not comply* with minimum lot size restrictions. Consequently, if the sale of Lot 63 to the Trustee created a noncompliant lot, then that sale violated the Code irrespective of the exception in section 88-820-01-B. As discussed *supra*, the lot consolidation provision applied to Lots 63-65 on its effective date in 2011. In 2017, Lot 63 was sold to the Trustee. At the time of that conveyance, Lot 63 did not meet the lot size requirements of the Code. The conveyance thus diminished compliance with the lot size requirements of the Code in that a previously consolidated lot (the merged Lots 63-65) was split off into two lots (63, and 64-65) and resulted in Lot 63 no longer complying with

18

lot width or lot area requirements.  Accordingly, the 2017 conveyance was made in violation of the Code.  An uncorrected violation of the Code is itself considered grounds for the withholding of permits or other forms of authorization.  Code § 88-615-05-C.

The Trustee makes further arguments that the exception contained in section 88-820-01-B is intended as a "grandfather" clause that seeks to ensure that a preexisting use may be continued even if that use became nonconforming as a result to amendments to the Code.  However, the exception in section 88-820-01-B does not address existing uses at all; rather, it addresses existing areas of land.  The Code expressly distinguishes between nonconforming lots and nonconforming uses.  The Trustee has failed to make any attempt to argue or explain how ownership of a lot is itself an existing "use" of the lot.  Although there is no question that Lot 63 was once a separate lot, there is no indication in the record that it was ever *used* as a separate lot in the years leading up to the lot consolidation provision's effective date.  Rather, all of the evidence before the BZA indicated that Lots 63-65 had been used, fenced, and taxed in conjunction, as a single property at the address of 1619 Jefferson Street.

We conclude that the exception in Code section 88-820-01-B.1 allows a use to be made of areas of land described therein under the conditions described therein.  It does not deem those areas of land to be compliant lots, but rather allows the identified use to be made of such areas of land despite their noncompliance.  The splitting off of Lot 63 was itself a violation of the Code after Lots 63-65 were deemed consolidated.  The BZA did not misinterpret Code section 88-820-01-B.

### Argument Three

The Trustee contends that the exception contained in section 88-820-01-B must control over the lot consolidation provision because the exception contained in section 88-820-01-B was

19

adopted later. Essentially, the Trustee argues that there is a conflict between the two provisions and therefore the provision adopted later must prevail over the earlier adopted provision. We disagree.

We find that the lot consolidation provision of section 88-610-03-C and the exception contained in 88-820-01-B can be harmonized. As discussed *supra*, although the exception in section 88-820-01-B authorizes a use of certain areas of land, it does not follow that such areas of land are considered compliant lots. Accordingly, after Lots 63-65 were deemed consolidated, Lot 63 could not be split off from the consolidated lot and sold in a manner that diminished compliance with the code. Lot 63 was split off from the consolidated lot in a manner that rendered Lot 63 out of compliance with the lot size requirements contained in the Code, thereby violating the Code. Accordingly, the use exception contained in section 88-820-01-B was not applicable to the Trustee.

Assuming *arguendo* that there is a conflict between the two provisions, the city's legislative body has expressly addressed how to interpret provisions in the event of a conflict. Section 88-10-08-B dictates a result in the event of a conflict between two provisions in the Code:

> If the provisions of this zoning and development code are inconsistent with one another, or if they conflict with provisions found in other adopted ordinances or regulations of the city, the more restrictive provision will control. The more restrictive provision is the one that imposes greater restrictions or more stringent controls.

In this matter, the lot consolidation provision imposes greater restrictions upon the sale or use of a lot deemed consolidated. Accordingly, the legislative body has expressed its intent that, in the event of a conflict, the lot consolidation provision controls over the exception contained in 88-820-01-B.

**Argument Four**

The Trustee argues that the BZA's decision is illegal because the BZA failed to grant the decision of the Permit Division a presumption of correctness. Section 88-575-08 of the Code relates to the BZA's authority with respect to hearing appeals and issuing a decision. Section 88-575-08-B provides, in relevant part:

> In acting on the appeal the board of zoning adjustment must grant to the administrative official's decision a presumption of correctness, placing the burden of persuasion of error on the appellant. In exercising the appeal power, the board of zoning adjustment has all the powers of the official from whom the appeal is taken, and the board of zoning adjustment may reverse or affirm wholly or partly or may modify the decision being appealed. . . .

In this matter, the Trustee essentially contends that Thompson, as the appellant before the BZA, failed to establish that the Permit Division's decision was in error; however, the Trustee fails to advance any further arguments as to how Thompson failed to carry her burden of persuasion in the BZA appeal, aside from referencing the Trustee's previous arguments regarding the interpretation of the Code.[8]

At the BZA hearing, Thompson presented numerous provisions of the Code as exhibits, made arguments regarding the interpretation of these provisions, and presented evidence and testimony to establish that certain provisions, including the lot consolidation provision, applied to the lots at issue. The BZA could and did find that Thompson had carried her burden of persuasion to establish that the initial administrative decision was in error. The BZA did not erroneously fail to grant the Permit Division's decision a presumption of correctness.

---

[8] Despite framing this argument as a legal issue regarding the BZA's interpretation of the Code, the Trustee's argument would make more sense if presented as a challenge to the sufficiency of the evidence. However, the Trustee does not challenge the sufficiency of the evidence before the BZA or make any factual argument regarding how the presumption of correctness was improperly applied.

21

**Argument Five**

The Trustee contends that the BZA decision was illegal to the extent that it was based on issues aside from compliance with the zoning requirements of the Code. The Trustee argues that permit decisions are ministerial rather than discretionary acts, and permit applications "may not be refused if the requirements of the applicable ordinance have been met." *See Curry Inv. Co. v. Bd. of Zoning Adjustment of Kansas City, Missouri*, 399 S.W.3d 106, 109 (Mo. App. W.D. 2013). However, the Trustee fails to allege or argue that the BZA based its decision on any matter outside of the requirements of the Code. Without providing any arguments or pointing to any facts that suggest that the BZA based its decision on improper considerations, the Trustee cannot establish that the BZA erred on this ground.

The Trustee's point on appeal is denied.

**Conclusion**

The BZA's decision is affirmed.


_____
Thomas N. Chapman, Judge


All concur.

22